UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DARRYL HALL,

                          Plaintiff,

      vs.

                                      9:07-CV-714

EKPE D. EKPE, JOHN CROWLEY, MARK LALONDE,    (TJM/GJD)
B. BAKER, and MARK CHALOM,

                      Defendants.
_____

DARRYL HALL, Plaintiff *Pro Se*
C. HARRIS DAGUE, Assistant Attorney General for Defendants

THOMAS J. McAVOY, Senior United States District Judge

## MEMORANDUM DECISION AND ORDER

    In this civil rights complaint and supplemental complaint,[1] plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), alleges that his mail was improperly handled on various occasions, that he was denied the right to practice his religion, and that he was denied adequate medical care for his back in violation of his First, Eighth, and Fourteenth Amendment rights. Compl. & Supplemental Complaint (SC)(Dkt. Nos. 1, 23). Plaintiff's religious exercise claims are also based upon the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*

    Presently before the court[2] are plaintiff's motion for partial summary judgment and defendants' cross-motion for summary judgment (Dkt. Nos. 35, 39). The parties have opposed the respective motions for summary judgment. (Dkt. Nos. 39 and 42). For the following reasons, this

---

[1] Plaintiff's original complaint was filed on July 9, 2007. (Dkt. No. 1). The text of plaintiff's initial complaint ends with ¶ 230. With the court's permission, plaintiff filed a "Supplemental Complaint" in November 2007. (Dkt. No. 23). The numbered paragraphs in the Supplemental Complaint begin with ¶ 231. *Id.*

[2] The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for the purposes of these motions, and as such, any appeal taken from this order, if appropriate, will be to the Court of Appeals for the Second Circuit.

court will grant defendants' motion for summary judgment as to all claims and will order the

complaint dismissed.

## DISCUSSION

1.    <u>**Summary Judgment**</u>

Summary judgment may be granted when the moving party carries its burden of showing the

absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716,

720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must

be viewed in the light most favorable to the party opposing the summary judgment motion." Id.

However, when the moving party has met its burden, the nonmoving party must do more than

"simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric*

*Industrial Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); see also *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial

responsibility of informing the court of the basis for the motion and identifying the portions of the

"'the pleadings, depositions, answers to interrogatories, and admissions on the file, together with

any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-movant bears the burden

of proof at trial, the moving party may show that he is entitled to summary judgment by either (1)

pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the

non-movant's evidence that demonstrate the absence of a genuine issue of material fact.  *Salahuddin*

*v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23).  The second

method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings.

*Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

## 2. Facts

Plaintiff is currently incarcerated at Hudson Correctional Facility, but was in Riverview Correctional Facility for almost three years prior to his transfer to Hudson in September 2007.[3] Dague Decl. Ex. B, Deposition Transcript ("Depo.") at 7, 21 (Dkt. No. 39). Plaintiff's Ramadan claims relate to the Ramadan holiday in September and October 2006. (Compl. at ¶¶ 49-108). The events forming the basis for plaintiff's mail claims occurred in 2006 and 2007. (Compl. at ¶¶ 18-48; SC at ¶¶ 235-46). The incidents relating to plaintiff's medical care claims began in March 2007. (Compl. at ¶¶ 109-42).

### A. "Privileged Mail" Claims

Plaintiff claims that his "privileged mail" was improperly opened outside of his presence on March 6, May 8, August 18, and September 22, 2006, and June 13 and September 4, 2007. (Compl. at ¶¶ 18-48; SC at ¶¶ 235-36, 244). At his deposition, plaintiff explained that the usual process for mail delivery is that general correspondence is delivered to inmates in their housing units. (Depo. at 13). Privileged mail is held in a designated area. (Depo. at 12). When an inmate receives privileged mail, he reports to that area, where a prison employee opens the mail in front of the inmate. *Id.* The

---

[3]At his deposition, plaintiff testified that he requested a transfer to a correctional facility closer to his home. (Depo. at 7). Plaintiff stated that the transfer occurred in late September 2007, almost three months after he filed the complaint in this court. *Id.*

employee checks the mail for contraband, and then hands the inmate his privileged correspondence. (Depo. at 12-13).

Plaintiff states that on March 6, 2008, he received privileged mail during the general mail distribution. (Compl. at ¶ 19). The item was stamped "Protected Health Information, To Be Opened By Addressee Only," but had been opened prior to delivery to plaintiff. *Id*. at ¶ 20. On May 8, 2006, plaintiff was called to the facility's legal mail distribution area. *Id*. at ¶ 24. When he arrived, he was given a piece of mail from the New York City Health and Hospitals Corporation that had already been opened, and "opened in error" was written on the envelope. *Id*. at ¶ 26.

On August 18, 2006, plaintiff states that he received privileged mail consisting of mental health records during the general mail distribution. *Id*. at ¶¶ 31-32. Plaintiff states that this mail was marked "Health and Hospitals Corporation-Bellevue Hospital Center-Medical Correspondence-GE7," and the mail had been opened outside of his presence. *Id*. at ¶ 32. On September 22, 2006, plaintiff was again called to the facility's legal mail distribution area. *Id*. at ¶ 43. When plaintiff arrived, he was given an item of mail from Mental Hygiene Legal Service labeled "Legal Mail," that had already been opened outside of his presence. *Id*. at ¶¶ 44-45. On June 13, 2007, plaintiff was called to the legal mail distribution area, and handed mail from the Kings County District Attorney that had already been opened. (SC[4] at ¶¶ 235-36). Plaintiff claims that on September 4, 2007, legal mail from the United States Marshals Service was opened outside his presence, and that "Opened in Error" was again written on the envelope. *Id*. at ¶ 244.

Defendant Rebecca Baker, the Senior Mail and Supply Clerk at Riverview Correctional Facility, submitted an affidavit in support of defendants' motion for summary judgment. Baker Aff. at ¶ 1 (Dkt. No. 39-12). Defendant Baker states that her review of the mail room records and log

---

[4] Plaintiff filed the supplemental complaint in order to allege the last two instances of interference with his mail. Those are the only claims made in the supplemental pleading.

books for the dates alleged show that "only the May 8, 2006 letter was actually opened outside of plaintiff's presence by the mail room staff." *Id*. at ¶ 10.  Defendant Baker states that on that day, the correct procedure for erroneously opened mail was followed, and a notation of the error was made in the log book and on the envelope containing the correspondence.  *Id*.

Defendant Baker states that she found no entry in the privileged mail log book for the August 18, 2006 correspondence.  Baker Aff. at ¶ 11.  She states that "[i]t appears that due to some ambiguity regarding the proper recipient, the correspondence was forwarded to Riverview's medical unit for a determination."  *Id*.  A copy of the envelope shows that the letter was addressed to "Darryl Riverview Correctional Facility" and was sent to P.O. Box 158 in Ogdensburg.  *Id*. at Ex. 5.  According to Defendant Baker, inmate mail should be mailed to P.O. Box 247, and that P.O. Box 158 is the facility's general mailbox.  *Id*. at ¶ 14.  Defendant Baker states that the medical staff opened the correspondence and wrote "To: Hall 97A1672" in order to properly route the correspondence to plaintiff.  *Id*. at ¶ 11.

Defendant Baker states that the March 6, 2006 letter was also sent to the medical unit because it was improperly addressed P.O. Box 158 instead of P.O. Box 247.  Baker Aff. at ¶ 14.  A copy of the envelope shows that "Riverview Correctional Facility" was the first line of the address, but that the second line contained plaintiff's last name and his identification number, "Hall 97A1672."  *Id*. at Ex. 7.  The envelope was stamped with "PROTECTED HEALTH INFORMATION, TO BE OPENED BY ADDRESSEE ONLY".  *Id*.  Defendant Baker states that it was "unclear" whether the piece of mail should have gone to plaintiff or to the medical unit. *Id*. at ¶ 14.  Defendant Baker states that "the mail room took the proper steps in forwarding the letter to medical as the letter was not addressed to the inmate properly." *Id*. at ¶ 15.

Defendant Baker states that she "disagree[s] with plaintiff's claim" that the September 22,

2006 letter was opened outside of his presence.  Baker Aff. at ¶ 16.   After reviewing the privileged

mail log book, defendant Baker did not find an entry regarding this piece of mail.  Defendant Baker

states that plaintiff believes that this correspondence was opened outside of his presence because

there was tape on the outside of the envelope.[5]  Defendants claim that the tape, was not affixed by

anyone in the mail room and was likely the way that the ***sender*** sealed the envelope before mailing

the correspondence. *Id*. at ¶ 17.

Plaintiff states that he filed a grievance after each alleged incident of interference with his

mail. (Compl. at ¶¶ 21, 27, 33, 46; SC at ¶¶ 237, 245).  In the grievances, plaintiff generally asked

that defendants refrain from opening plaintiff's privileged mail outside his presence.  He also

requested varying forms of relief, including that the matter be investigated, that action be taken

against the responsible parties, that the responsible parties be fired, that he be transferred to another

facility, and that action be taken against the Superintendent. *Id*.  Plaintiff states that although the

specific relief was denied, the Inmate Grievance Resolution Committee (IGRC) granted his

grievances to the extent that facility employees were directed to abide by the directives in place for

handling the mail.  (Compl. at ¶¶ 22, 28, 34, and 47; SC at ¶¶ 237).  Plaintiff seems to allege that

Defendants Superintendent Ekpe and Deputy Superintendent Crowley were involved in these

alleged constitutional violations because of their involvement in the grievance process, in the

investigations of plaintiff's allegations, and in the alleged failure to correct the violations. (Compl.

at ¶¶ 23,30, 36, 46; SC at ¶¶ 233, 238, 246).

### B.  Ramadan Claims

Plaintiff states that he is registered as a Muslim, and that he has been a follower of Islam for

---

[5] Plaintiff does not mention this "tape" in the complaint or the supplemental complaint, but in his
September 26, 2006 grievance, he states that "[w]hen I received the envelope I noticed that it had already been
opened and there was a piece of scotch tape holding the flap closed." Pl. Ex. I at 2 (Dkt. No. 35-5).

approximately twenty years. (Compl. at ¶¶ 49-50). Plaintiff states that as of September 22, 2006, he had not been attending Friday Juma'h prayer services because of "personal problems." *Id.* at ¶ 53. When he attended the Friday Juma'h prayer service on September 22, 2006, plaintiff stated his intention to participate in fasting for the month of Ramadan, as he had in previous years at Riverview and at other facilities. *Id.* at ¶¶ 53-54. Plaintiff was advised that his name was not on the Ramadan participant list, and that in order for him to participate, his name would need to be added to the list. *Id.* at ¶¶ 55-56. Plaintiff was also advised that inmates who wanted to participate in Ramadan were required to attend the Friday Juma'h prayer services in the weeks leading up to Ramadan, or they would have to be approved by Imam Rahim or Defendant Crowley. *Id.* at ¶ 57.

During Ramadan, participants receive certain privileges including early morning release from their cells, provision of special meals, provision of meals before and after non-Muslim inmates eat, and additional recreation times. LaLonde[6] Aff. at ¶ 7 (Dkt. No. 39-6). Plaintiff states that on September 24, 2006, the first day of Ramadan, he began fasting. (Compl. at ¶ 60). At 4:15 p.m., plaintiff went to the facility mosque in order to participate in the ritual which included breaking the fast. (Compl. at ¶ 61). Plaintiff states that he was turned away at the mosque and was told that he could not participate unless his name was on the list. *Id.* at ¶ 61. Plaintiff states that on Monday, September 25, 2006, he spoke with Defendant Reverend Weidler about being added to the Ramadan participant list. *Id.* at ¶ 62. In his affidavit, Reverend Weidler stated that he told plaintiff that he would check with Imam Rahim to make sure that plaintiff's name was not erroneously omitted from the list. Weidler Aff. at ¶ 5 (Dkt. No. 39-8).

Reverend Weidler states that Imam Rahim was "gravely ill" and at the hospital during Ramadan 2006. Weidler Affidavit at ¶ 6. Reverend Weidler visited Imam Rahim ***in the hospital***,

---

[6] Defendant Mark LaLonde is the Coordinating Chaplain and Catholic Deacon at Riverview. LaLonde Aff. ¶ 1.

and asked him about including plaintiff on the Ramadan participant list. *Id.*  At the meeting in the hospital, Imam Rahim told Reverend Weidler that plaintiff was not eligible to participate in Ramadan because he had not attended the weekly Juma'h prayer services. *Id.* at ¶ 7.  Reverend Weidler states that at the meeting, "Imam Rahim handwrote a note regarding the eligibility [of] certain inmates to participate in the formal Riverview Ramadan event." *Id.*  Reverend Weidler attached the note to his affidavit that shows plaintiff's name with the notation "No Attendance Since March." *Id.*  On September 26, 2006, Reverend Weidler wrote a memorandum to defendant Deputy Superintendent Crowley about the meeting with Imam Rahim. *Id.* at ¶ 9.  Reverend Weidler states that he informed plaintiff of Imam Rahim's decision. *Id.* at ¶ 10.

Plaintiff filed a grievance regarding the denial of his participation. *Id.* at ¶ 66.  As a result of plaintiff's inability to formally participate in the Ramadan services, plaintiff states he was not able to participate in the pre-dawn prayers and meals, and he alleges that he experienced "physical and mental hardships". *Id.* at ¶ 68.  Plaintiff states that on September 27, 2006, he complained in-person to defendant Deputy Superintendent Crowley about these hardships. *Id.*  In his affidavit, defendant Crowley states that he told plaintiff that he was free to observe Ramadan on his own "and that his ineligibility only affected his ability to participate in the facility's formal Ramadan event not his own private observance of his faith."  Crowley Aff. at ¶ 12 (Dkt. No. 39-10).

On October 2, 2006, plaintiff wrote to defendants Superintendent Ekpe, Deputy Superintendent Crowley, and Deacon Mark LaLonde, objecting to the attendance policy. (Compl. at ¶ 72).  On October 16, 2006, plaintiff submitted a request to defendants Crowley and LaLonde to attend the post-Ramadan prayers called Eid Al Fitur. *Id.* at ¶ 76.  Plaintiff stated that he had been attending the Friday Juma'h prayer services, and fasting during Ramadan. *Id.* at ¶ 77.  Plaintiff states that he received no response to either letter. *Id.* at ¶ 78.  Plaintiff claims that on October 16,

2006, he approached defendant Ekpe to ask about the status of plaintiff's requests and grievance. *Id*. at ¶ 80. According to plaintiff defendant Epke's response was belligerent, and instead of answering plaintiff's questions, defendant Epke stated that "you're a nut case anyway, you belong in a nut house, and if you're not careful, that's where you will end up." *Id*. at ¶ 84. Plaintiff states that several inmates laughed, and that plaintiff then walked away. *Id*. at ¶ 85.

Plaintiff states that he went to sick call on September 28, October 6, and October 10, 2006 complaining of dizziness and weight loss. (Compl. at ¶ 73). Plaintiff attributes these symptoms to an inadequate diet. *Id*. Plaintiff states that medical staff responded that plaintiff should stop fasting, or get permission to attend Ramadan services. *Id*. at ¶ 75. Defendant LaLonde states that because plaintiff attended the Friday Jumah prayer services during Ramadan, he was permitted to participate in the Muslim fast of Shawwal, a separate event that commences at the conclusion of Ramadan. LaLonde Affidavit at ¶ 24 (Dkt. No. 39-6).

**C. Defamation Claim**

The basis of plaintiff's defamation claim is the alleged incident in which defendant Epke called plaintiff a "nut-case." Plaintiff states that on the same day, and "on several occasions thereafter," plaintiff was harassed by other inmates "as a result of Defendant Ekpe's reference to plaintiff's mental health history." Compl. at ¶ 86. Defendant Ekpe acknowledges that he saw plaintiff on October 16, 2006. Ekpe Affidavit at ¶ 2 (Dkt. No. 39-16). Defendant Ekpe states that he recalled plaintiff "telling me he was going to sue me or file a grievance against me. I told the inmate those actions were within his rights and I continued on my facility rounds." *Id*. Defendant Ekpe denies that he ever made any comment to plaintiff about being a "nut". *Id*. at ¶ 3. Defendant Ekpe further states that he was not aware of plaintiff's mental health history, and that he would not raise that issue in an informal meeting with an inmate. *Id*.

### D.  Medical Treatment Claims

In March 2007, plaintiff was moved from the E-1 housing unit to the F-2 housing unit. While in E-1, plaintiff was housed in a "single cube," but upon transfer, was assigned to the top bunk in a "double occupancy cube."  (Compl. at ¶¶ 109-10).  Plaintiff states that he has a history of back problems, and he complained to the F-2 housing unit officer.  *Id*. at ¶ 111.  Plaintiff states that he complained about "extreme lower back pains" and about his top bunk assignment at sick call on March 22, 2007.  *Id*. at ¶ 113.  Plaintiff told the sick call nurse that he had "a bulge in his Disc," and that he had been issued a bed-board and a back brace at the previous facility.  *Id*. at ¶ 114.  Plaintiff states that the nurse gave him some Ibruprofen or aspirin and put him on the schedule to see the doctor the next week.  *Id*. at ¶ 115.

Plaintiff states that he remained assigned to the top bunk and continued to have severe back pains.  (Compl. at ¶ 119).  Plaintiff states that he complained again about his back pain at sick call on April 13, 2007.  *Id*. at ¶ 120.  Plaintiff was informed that he was on the list to see the doctor.  *Id*. at ¶ 121.  Plaintiff filed a grievance that day regarding his medical care.  *Id*. at ¶ 125.  Plaintiff states that on April 19, 2007, he was seen by defendant Dr. Chalom.  *Id*. at ¶ 127.  In his affidavit, Dr. Chalom states that he diagnosed plaintiff with degenerative disc disease, and recommended treatment with analgesics.  Chalom Aff. at ¶ 7 (Dkt. No. 39-14).  Dr. Chalom determined that plaintiff was not in need of a bottom bunk permit at that time.  *Id*.

Plaintiff states that on May 20, 2007, he was examined by Dr. Seidman.[7]  Compl. ¶ 139.  Dr. Seidman prescribed pain medication and muscle relaxers, and issued plaintiff a bottom bunk permit.  (Compl. at ¶ 140.  Dr. Chalom states that the only time he treated plaintiff was on April 19, 2007.

---

[7]  In the complaint, plaintiff spells the doctor's name, "Sideman."  Compl. ¶¶ 139-40.  However, the medical records contained in plaintiff's exhibits show that the correct spelling is "Seidman," and the court will use the proper spelling. *See* (Dkt. No. 42-2 at 39).

Chalom Affidavit at ¶ 9.  Dr. Chalom also states that plaintiff refused medical treatment for his back pain on April 13 and May 5, 2007.  *Id*. at ¶ 10-11.  Plaintiff's Ambulatory Health Record ("AHR") shows that on April 13, 2007, plaintiff refused the Ibuprofen offered by the nurse for his back pain. (Dkt. Chalom Aff. Ex. A (Dkt. No. 39-15).  The AHR shows that on May 5, 2007, plaintiff also refused to see the doctor for treatment of the back pain.  *Id*.

**3.    Interference with Mail**

Under the First Amendment, prisoners have a right "to the free flow of incoming and outgoing mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)(citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  A prisoner's right to receive and send mail may, however, be regulated.  *Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir. 1997).  A regulation affecting an inmate's attempt to send or receive mail "is valid if it is reasonably related to legitimate penological interests." *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir. 1987)(quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal or  "privileged" correspondence than to general correspondence, as well as greater protection to outgoing mail than to incoming mail. *See e.g. Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006).  Privileged correspondence is defined as mail received from "Governmental/public officials . . . Legal services . . . ; or Medical services . . . ." Department of Correctional Services (DOCS) Directive # 4421.  Directive # 4421 consists of sections of the New York State regulations concerning privileged correspondence. N.Y. CODE RULES & REGS. tit.7,  § 721.2(a)-(d)(NYCRR).

Incoming privileged correspondence must be opened in the presence of the inmate to whom it is addressed and may not be read without express authorization of the superintendent. 7 NYCRR

11

§ 721.3(b)(1).  In order to keep track of the receipt and delivery of privileged mail, officials use a "Privileged mail log." *Id.* § 721.3(b)(3).  This log identifies the sender and includes the inmate's name and number; the delivery date and time; the title of the delivery person; and shall contain a notation if the inmate refused to sign the receipt. *Id.*  If the privileged correspondence is erroneously opened outside the inmate's presence, the regulation provides that a "log entry" must be made and if appropriate, a photocopy of the erroneously opened envelope shall be included. *Id.* § 721.3(b)(1). Any relevant explanation of why the error occurred will be included in the log. *Id.* § 721.3(b)(3).

General correspondence procedures are governed by DOCS Directive # 4422.  All incoming general correspondence is opened and inspected. DOCS Directive # 4422(III)(G)(1).  In December of 2002, this section of directive 4422(III)(G) was amended to state that before opening, an inmate's incoming mail should be checked to make sure that the addressee can be accurately identified and is currently at the facility. *Id.* # 4422(G)(1)(a) (included in Baker Aff. Ex. 2).  If the addressee cannot be properly identified, the mail is stamped "Return to Sender-Addressee Cannot be Identified." *Id.*

An isolated incident of mail tampering has been held to be insufficient to state a constitutional claim, and thus, an inmate must show that the prison officials "'regularly and unjustifiably interfered with the incoming mail.'" *Cancel v. Goord*, No. 00 Civ. 2042, 2001 U.S. Dist. LEXIS 3440, *19-20 (S.D.N.Y. March 29, 2001)(citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986).  Generally, the cases involving "privileged" correspondence involve "legal" mail, but interference with any "privileged" mail is treated similarly.[8]

In this case, plaintiff complains that his privileged mail was opened outside of his presence on six occasions.  The court must determine whether the interference with plaintiff's mail was

---

[8]  The difference with "legal" mail is that in addition to the right to send and receive mail, inmates also have a right of access to courts that can be implicated.  However, in an access to courts claim, the Supreme Court has specifically held that the plaintiff must show actual injury to a legal claim as a result of the deficient access to courts. *Lewis v. Casey*, 518 U.S. 343 (1996).

"justified."  Defendant Baker addresses only the first four instances of alleged interference with

plaintiff's mail.[9]  Defendant Baker states that only the May 8, 2006 correspondence was actually

opened outside the inmate's presence "by the mail room staff." Baker Aff. ¶ 10.  On May 8, 2006,

the mail room attendant made a notation of the error in the log book and made a copy of the

envelope which bore the notation "opened in error." *Id.* & Exs. 3 (log book); 4 (copy of the

envelope).

Defendant Baker explains that the March 6, 2006 correspondence and the August 18, 2006

correspondence were routed to the medical unit because of some ambiguity on the envelope

regarding the proper recipient of the mail. Baker Aff. ¶ 11, 6.  Both the March 6, 2006 and the

August 18, 2006 correspondence contained medical information.  The first problem cited by

defendant Baker is that both envelopes were addressed to the facility's post office box number,

rather than the post office box number for inmate mail. Baker Aff. ¶ 14 & Exs. 5, 7.  It was

reasonable for the mail room personnel to believe that medical records were to be sent to the facility

medical unit.

In addition to containing the incorrect post office box number, the August 18, 2006

correspondence was addressed only to "Darryl" with no last name and no inmate identification

number. Baker Aff. Ex. 5.  Because the return address indicated that the contents might be medical

information, once again, the mail room personnel sent the letter to the medical unit, and the medical

unit opened the mail, placed plaintiff's name on the front and sent it to plaintiff. Baker Aff. ¶ 11.

Thus, it was not the mail room personnel who opened plaintiff's correspondence on March 6, and

August 18, 2006, rather the mail was opened by the medical unit personnel in an effort to determine

---

[9] The court notes that defendant Baker does not address the two instances of alleged "tampering" that
plaintiff raises in his supplemental complaint.  However, the court has considered those claims and finds that they do
not raise a genuine issue of material fact based on the evidence presented by defendants.

the proper recipient.

Defendant Baker also states that on October 23, 2006, she received a communication notifying her that due to an inmate grievance regarding inmate mail, DOCS had implemented a new policy regarding incoming mail that was improperly addressed. Baker Aff. ¶ 13.  The new policy stated that any incoming mail that was not properly addressed with the inmate's identification number and "locking location" would be "returned to sender." *Id.*  Based upon the evidence presented, including the copies of the envelopes, it appears that there is a reasonable explanation for any errors that may have occurred with the March 6 and August 18, 2006 correspondence.  In addition, since the correspondence was opened in the medical unit, the confidentiality of plaintiff's medical records was maintained.[10]

Plaintiff believes that the September 22, 2006 correspondence was opened outside his presence because there was tape on the envelope.  Defendant Baker states that there is no entry in the privileged mail log book indicating that the correspondence was opened by the mail room personnel. Baker Aff. ¶ 17.  Defendant Baker has submitted a copy of the log book entries for September 22, 2006.  The fact that an envelope contains tape on the flap is not necessarily an indication that it was opened or that if it was opened, the mail room was responsible for opening it and taping it closed.

The last two instances are raised in plaintiff's supplemental complaint and occurred in June and September of *2007* . (SC at ¶¶ 235-36, 244).  Both of these pieces of correspondence appear to have been legal mail, one from the Kings County District Attorneys Office and one from the United States Marshals Service.  Plaintiff states that both of the envelopes bore the notation that they were "opened in error." *Id.*   Although plaintiff attempts to aggregate all of these instances into a claim

---

[10] The court will address plaintiff's privacy claims in the following section of this Memorandum Decision and Order.

that plaintiff's mail was being repeatedly opened or read, it is clear that of the first four instances, one was truly opened in error, and two were justifiably opened by the medical unit because plaintiff's identity was unclear from the envelope.  There is no indication that the mail room personnel put tape on the flap of the fourth piece of correspondence.

The last two instances occurred almost one year later, and three months apart.  It is clear even from the Directives that there will be instances in which mail is opened in error.  That is one of the reasons for the creation of the privileged mail log, and the rules governing the procedures to be used when mail is opened in error.  The court finds based on all the evidence presented that plaintiff has not shown that his First Amendment right to the free flow of correspondence has been violated by any of the defendants.

**4.    Privacy**

In addition to claiming that his right to the free flow of correspondence has been violated, plaintiff claims that his constitutional and statutory right to privacy was violated when the correspondence containing his mental and medical records was opened prior to delivery to him. The Due Process Clause of the Fourteenth Amendment protects inmates from the unwanted disclosure of health-related information. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994), *cited in Verley v. Goord*, 2004 U.S. Dist. LEXIS 857, *60 (S.D.N.Y. Jan. 22, 2004).  Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999).

With respect to the "disclosure" of medical information, the court notes that an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000).  In *Rodriguez v. Ames*, the court also held that where the information is spread through "humor or

gossip," it is more likely that the inmate's right to privacy will have been violated. 287 F. Supp. 2d at 220 (citing *Powell*, 175 F.3d at 112).

Assuming that there was a disclosure of medical information in this case, the information was "disclosed" to medical personnel, solely for the purpose of identifying the appropriate recipient of the correspondence. There was no ***active*** disclosure of confidential medical records, and plaintiff does not claim otherwise. There was no disclosure for the purpose of harassment, humor, or gossip. Therefore, no privacy right was violated in such a disclosure.

Plaintiff also cites N.Y. MENTAL HYGIENE LAW § 33.13 as a basis for bringing this action against defendants. This section of the Mental Hygiene Law applies to disclosure by "mental health care facilities," and does not extend to private individuals who divulge mental health information. *Dobies v. Brefka*, 263 A.D.2d 721 (3d Dep't 1999). Although the individuals in the mail room are not "private individuals," they are not entities that are covered by this section of the Mental Hygiene Law. Thus, section 33.13 does not apply to any "disclosure" by these defendants.

**5.** **Defamation**

The basis for plaintiff's defamation claim against defendant Ekpe is that on October 16, 2006, this defendant met plaintiff in the facility and defamed plaintiff by calling him a "Nut-Case," telling plaintiff that he belonged in a "Nut-House," and threatening plaintiff with placement in a "Nut-House." Compl. ¶¶ 170-76. Defendant Ekpe denies that he ever made these statements. Ekpe Aff. ¶ 3. It is well-settled, however, that defamation does not rise to the level of a constitutional claim and is, thus, not actionable under section 1983. *Rolon v. Henneman*, 517 F.3d 140, 148 (2d Cir. 2008)(citing *Paul v. Davis*, 424 U.S. 693, 712 (1976)). Thus, plaintiff cannot bring a claim for defamation against Superintendent Ekpe, regardless of what was said during the October 16, 2006 conversation.

The court also finds even assuming that defendant Ekpe called plaintiff a "Nut-Case," this comment alone is not the equivalent of disclosing plaintiff's mental health information. There is absolutely no evidence, nor does plaintiff cite any facts showing that defendant Ekpe would have been aware of plaintiff's prior mental heath condition. Even assuming that plaintiff's records were opened in the mail room[11] there is no evidence that defendant Ekpe, who is the Superintendent of the facility would have been aware of plaintiff's information or even of the mail room incident. Calling plaintiff a "Nut-Case" falls far short of disclosing extremely sensitive medical information.

The court would also point out that to the extent that plaintiff 's claim could be interpreted as attempting to allege that defendant Ekpe verbally harassed plaintiff, verbal harassment and name-calling simply are not constitutional violations cognizable under Section 1983. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Vega v. Artus*, 610 F. Supp. 2d 185, 209 (N.D.N.Y., Mar. 26, 2009). Thus, plaintiff's defamation claims are dismissed.

**6.   Religion**

The court notes that plaintiff's religion claims[12] all are based upon plaintiff's challenge to Imam Rahim's policy requiring an inmate's attendance at Friday Juma'h services in order to be eligible to participate in Ramadan events. However, because plaintiff was not allowed to participate in the formal Ramadan program, he claims to have been denied a proper religious diet, which resulted in plaintiff being denied adequate food, and thus being subjected to cruel and unusual punishment.

**A.  First Amendment**

It is well-settled that inmates have the right under the First and Fourteenth Amendments to

---

[11] The court in no way makes this finding.

[12] Compl. ¶¶ 177-220.

freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990).  The analysis of a free exercise claim is governed by the framework set forth in *O'lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006)(citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that in assessing a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, 2007 U.S. Dist. LEXIS 27702, *12-13 (W.D.N.Y.  March 30, 2007)(citing *Salahuddin*, 467 F.3d at 274).  Finally, once prison

officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

In this case, plaintiff's central complaint is that he should have been allowed to participate in the facility's Ramadan events in 2006. Plaintiff takes issue with the rule preventing a Muslim inmate from participating in Ramadan services if he missed three or more Friday Juma'h prayer services prior to Ramadan. Compl. ¶ 170. Plaintiff alleges that there is no written rule or regulation that requires any minimum attendance and that defendants Ekpe, Crowley, and LaLonde created this unconstitutional policy and allowed it to continue. Plaintiff makes a conclusory statement that other religions do not have this requirement. Compl. ¶ 97.

Defendants do not question the sincerity of plaintiff's beliefs, nor do they question the requirement of certain observances during Ramadan. The challenged policy does not "infringe" upon the inmates religious beliefs, rather the policy sets up a requirement of regular practice prior to participation. However, for purposes of argument, the court will accept that this policy would "infringe" upon the ability of certain inmates to participate in their religious event. Thus, the issue becomes whether this rule or policy is reasonably related to legitimate penological interests.

Defendant Crowley, the former Deputy Superintendent of Programs states that the policy was instituted by Imam Rahim to ensure that only inmates who actively participated in Muslim services were allowed to attend the holiday services. Crowley Aff. ¶ 6. During Ramadan, inmates are allowed to leave their cubicles earlier than other inmates, are provided with special meals, and are provided special recreation and worship times. *Id.* Defendant Crowley states that the attendance policy was created because permitting every Muslim inmate to participate even if he were not active in the faith could create tension between inmates, cause a security strain, and create unnecessary costs for the facility. *Id.* ¶ 7. Defendants also state that from a security standpoint, the attendance

policy also cuts down on the unnecessary movement of additional inmates. Def. Mem. of Law at 10 (Dkt. No.39-5).

Plaintiff concedes that he had not attended Friday Juma'h services because of "personal problems" for **three or four months** prior to Ramadan 2006.[13] (Depo. at 42). At his deposition, plaintiff stated that the Ramadan policy was explained to him when he first mentioned that he wished to participate. *Id.* at 36. Unfortunately, Imam Rahim became ill during Ramadan 2006, was hospitalized and later died. Crowley Aff. ¶ 8. Plaintiff testified that he spoke to Reverend Weidler, who agreed to go to the hospital and speak with Imam Rahim. (Depo. at 39). Reverend Weidler states in his affidavit that he spoke to plaintiff and agreed to ask Imam Rahim about plaintiff's situation because it was not within Reverend Weidler's authority to remedy.[14] Weidler Aff. ¶¶ 3-6.

Reverend Weidler went to the hospital, and Imam Rahim hand-wrote a note regarding the inmates who would be eligible to participate in the formal Ramadan event. *Id.* ¶ 7. Imam Rahim specifically noted that plaintiff had not attended services "Since March", thus, he was not eligible to participate. *Id.* & Ex. 1 (Imam Rahim's handwritten note). After his meeting with Imam Rahim, Reverend Weidler wrote a memorandum to defendant Crowley, memorializing the meeting with the Imam. Weidler Aff. ¶ 9 & Ex. 2. Imam Rahim died shortly thereafter. LaLonde Aff. ¶ 19.

This court finds the rule requiring regular attendance at Friday Juma'h services as a prerequisite to participation in the formal Ramadan events is completely reasonable. Additionally, plaintiff was not prevented from observing Ramadan. He stated during his deposition that he did fast, but had to make due with food from the commissary. (Depo. at 49). Plaintiff also testified that

---

[13] Imam Rahim's handwritten note states that plaintiff had "no attendance since March." Weidler Aff. Ex. 1. If Ramadan was September of 2006, then plaintiff had not attended Juma'h services for at least **five or six** months. The difference in the length of time is not relevant to the court's decision, and even if plaintiff had not attended services for only three or four months, the result is the same.

[14] Reverend Weidler is the Protestant Chaplain at Riverview. Weidler Aff. ¶ 1.

he began attending services during Ramadan, and the next month he was permitted to participate in

the voluntary fast.  *Id.* 53-54.  Nothing in the way defendants handled plaintiff's situation was

unreasonable.  The fact that Reverend Weidler went to the ***hospital*** to determine whether certain

inmates could participate in the Ramadan events shows that defendants were attempting to

accommodate plaintiff and others who might have wanted to participate.  The additional fact that

once plaintiff began regularly attending services, he was allowed to participate in formal events adds

support to the court's finding.[15]  Thus, plaintiff's First Amendment claim are dismissed.

The court notes that plaintiff has a separate claim that defendants failed to provide him with

his "religious diet."  Compl. ¶¶ 188-97.  This claim is related to the fact that plaintiff was not

allowed to participate in the Ramadan events, and he states that he had to make due on his own.

However, because defendants' policy regarding participation in the Ramadan events is reasonable,

plaintiff cannot make a separate claim that their failure to provide him with the special Ramadan

food at the special times violated his First Amendment rights.  Plaintiff chose to fast on his own and

attempt to obtain food from the commissary.

### B.  Religious Land Use and Institutionalized Persons Act (RLUIPA)

Plaintiff also brings claims under RLUIPA, 42 U.S.C. § 2000cc *et seq.*  RUILPA provides

that

No government shall impose a substantial burden on the religious exercise of a person

---

[15] As stated above, plaintiff alleges in passing that other religions were not subjected to a similar rule.  To the extent that plaintiff is attempting to raise an equal protection claims, he cannot succeed.  The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)(citation omitted).  Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  Conclusory allegations of disparate treatment or plaintiff's own belief that he is being treated differently than other inmates are insufficient to sustain an equal protection claim. *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 ( W.D.N.Y. 2008)(citations omitted).  The rule in this case was instituted by the Muslim Imam, and plaintiff has not shown that the other religions that he names had a similar month-long holiday, during which they would be provided special food, and special privileges, creating a need for such a rule.  Plaintiff's conclusory allegation that other religions did not have such rules does not create a genuine issue of material fact that would survive a motion for summary judgment.

residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)(citing 42 U.S.C. § 2000cc-2(b)).  The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id.*  The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord*, 05 Civ. 9680, 2007 U.S. Dist. LEXIS 78742, *15 (S.D.N.Y. Oct. 9, 2007)(citing *inter alia Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)).  Furthermore, the substantial evidence test presupposes that some inconveniences  may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004)(discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'").

Plaintiff cannot seriously argue that a requirement that an inmate attend his own religious services in order to be eligible to participate in the Ramadan events is a "substantial burden" on the right to practice his religion.  As defined above, a "substantial burden" is one that requires the inmate to modify his behavior and violate his beliefs.  *Singh v. Goord, supra.*  In fact, this

requirement appears to encourage Muslims to practice their religion.  Plaintiff does not argue that he

does not believe in attending regular services.  Rather he argues that he did not attend the services

because of "personal problems."

Even assuming that plaintiff was "substantially burdened," the defendants have set forth a

compelling state interest in ensuring that inmates are not attempting to take advantage of the special

privileges.  As stated above, this interest is based upon both security and financial purposes.  A rule

requiring attendance at Friday Juma'h services is a least restrictive method of achieving this goal.

Thus, plaintiff's RLUIPA claims cannot succeed.

**7.    Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical

treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two

elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.

2003).  The first element is objective and measures the severity of the deprivation, while the second

element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.

*Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has a

sufficiently serious illness or injury.  *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  A

medical condition has been considered "sufficiently serious" when there is a "condition of urgency,"

one that may result in death, degeneration, or extreme pain.  *Hathaway v. Coughlin*, 99 F.3d 550,

553 (2d Cir. 1996).  The seriousness of a plaintiff's medical need may also be determined by

reference to the effect of denying the particular treatment.  *Sonds v. St. Barnabas Hosp.*

*Correctional Health Services*, 151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted).  Thus, if

unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds*, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983). Thus, any claims of malpractice, or

24

disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff alleges that Dr. Chalom violated plaintiff's right to be free from cruel and unusual punishment by denying plaintiff a bottom bunk and pain medication, notwithstanding plaintiff's long-standing medical condition. Compl. ¶¶ 221-28.  In his affidavit, Dr. Chalom states that he examined plaintiff on April 19, 2007, after he was brought to the infirmary by corrections officers. Chalom Aff. ¶ 5.  Dr. Chalom states that he diagnosed degenerative disc disease and recommended a treatment plan of analgesics. *Id.* ¶ 6.  Dr. Chalom did not believe that plaintiff was in medical need of a "bottom bunk permit" at that time. *Id.* ¶ 7.  Dr. Chalom states that he had "no further involvement in providing medical care or treatment to plaintiff." *Id.* ¶ 9.

This court finds that, at worst, plaintiff disagreed with Dr. Chalom's recommendations.  It is true that plaintiff has been given a bottom-bunk permit at various times during his incarceration. The medical records also show that plaintiff was prescribed a bottom bunk in 2003 and in 2004 for three months. Pl. Exhibits (Dkt. No. 42-2 at 44, 45, 49, 50).  In a report dated May 22, 2007, Dr. Michael Seidman wrote that plaintiff was "currently in a bottom bunk." *Id.* at 39.  Plaintiff told Dr. Seidman that top bunks caused increased symptoms. *Id.*  Dr. Seidman prescribed Flexeril, supplemented with Motrin, and continued plaintiff on a bottom bunk. *Id.*  This court does not dispute that plaintiff has a back impairment or that he has been allowed at various times to have a bottom bunk permit, but the fact that plaintiff disagrees with either the diagnosis or the treatment that he received from Dr. Chalom on ***one occasion*** does not rise to the level of a constitutional claim.  Thus, plaintiff's medical care claims are dismissed.

**8.    Eleventh Amendment**

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995)(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).

This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  An action against state officers in their official capacities is tantamount to an action against the state.  *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991)(citations omitted).

The caption of plaintiff's complaint states that he is suing defendants in their "individual and official capacities."  Because the court is dismissing the entire complaint, it does not have to address this issue, however, to the extent that plaintiff was attempting to sue defendants for damages in their official capacities or to the extent that his complaint could be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so.  Any such claims are dismissed.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that plaintiff's motion for summary judgment (Dkt. No. 35) is **DENIED**, and it is

**ORDERED**, that defendants' cross-motion for summary judgment (Dkt. No. 39) is **GRANTED**, and the complaint and supplemental complaint are **DISMISSED IN THEIR ENTIRETIES.**

Dated:September 28, 2009

Thomas J. McAvoy
Senior, U.S. District Judge